## Case No. 14,940.
### UNITED STATES v. DE HARO.
[Hoff. Dec. 75.]

District Court, N. D. California.　June 13, 1862.

MEXICAN LAND GRANT — SURVEY — CONFLICTING
CLAIMS—SHAPE OF TRACT.

[This was a claim by the heirs of Francisco de Haro to the Rancho Laguna de las Mercedes.]

HOFFMAN, District Judge.　I do not deem it necessary to consider at any length the argument presented on behalf of the claimants, by which it is sought to prove that the whole tract delineated on the diseño should have been confirmed, and not merely half a league, to which their claim was restricted. The point was considered and decided by the board, and that decree has become final; nor have any objections to the survey been filed by the claimants on the ground that it embraces only half a league, as required by the decree, and not the much larger quantity delineated on the desiño. That the decree of the board was correct cannot be for a moment doubted.　The original petition of Galindo describes the land as one league in length by half a league in breadth. The witnesses whose testimony was taken by order of the governor variously estimate it as of the extent of "one league in length by half a league in breadth;" "three-quarters of a league in length by one-quarter of a league in breadth;" and "one league in length by half a league in breadth in some places, and a quarter of a league in others."　And in the fourth condition describes it as of a length equivalent to half a league, directs it to be measured, and reserves the surplus. In the deed from Galindo to De Haro, the ancestor of the claimants, the land is described as "one league in longitude, and one-half a league in latitude;" and the wife of De Haro, in a subsequent petition to the governor for an augmento, or extension, expressly states to him that the land purchased by her husband from Galindo was only half a league in extent, and was therefore too small, etc.　As this petition was never acted upon, and the only title of the claimants is derived from the grant to Galindo, it is plain that their pretension to any larger extent than half a league is wholly inadmissible.

The only question in the case is as to the location within the exterior limits of the half league confirmed to the claimants.　It appeared that when the case was pending before the board, a preliminary survey was made at the suggestion of the claimants, by John C. Hays, Esq., surveyor general.　On this survey the whole tract delineated on the diseño was run out; and the plat was then furnished by the surveyor to the administrator of the estate of the deceased, De Haro, who seems to have been conducting the litigation, with a request that the parties would designate the particular half league which they claimed under the grant.　The administrator referred the matter to Brown and Denniston, who had married heirs of De Haro, who marked out the half league on the plat, returned it to the surveyor, and then went with him on the ground, and the lines were run out and laid down on the plat.　The plat survey and field notes were filed in the cause by the surveyor general, at the request, as he states in his communication to the board, of the attorneys for the claimants.　Immediately after these proceedings, Brown and Denniston openly proclaimed that the lands outside of the half league so selected were public lands.　They took up and recorded a claim to a portion of those lands, and advised others who are now settled on the lands to do the like. Brown, as guardian for one of the heirs, leased some hundreds of acres of land embraced within the half league, and, having subsequently mortgaged the same land, a foreclosure was had, and it is now held under that title.　It appears also that Denniston and wife conveyed the same land to one Andrews, whose interest is now said to be vested in Mahoney, the present claimant of the whole tract within the exterior boundaries.　It also appears that in 1853, the surveyor general, considering the designation of the half league referred to as an election by the claimants, caused outside lands to be surveyed and sectionized as public land; and numerous settlers relying upon these circumstances, have entered upon the land in good faith; taken up preemption claims, paid their money, received certificates, and have erected improvements said to be worth more than $75,000.　It further appears that at the time the half league was selected it was considered the most valuable portion of the land; any subsequent change in value being chiefly due to the improvements made by the settlers.　It is now enough to change the location of the one-half league, and, abandoning the land previously selected and in part sold and mortgaged by Brown and Denniston, to locate anew, so as to include the lands occupied and improved as above stated.　The survey made in accordance with the recent wishes of the present claimant of the whole title has been objected to on the part of the United States.

It is objected on the part of the claimants that the settlers as such, have no right to intervene in this proceeding, and an elaborate argument has been made to show that they had no right, until after the quantity granted was segregated by competent authority, to enter upon any lands embraced within the exterior limits of the grant. But it is sufficient to observe in reply that the exceptions to this survey are filed by the United States, and not by the settlers.　The United States have certainly the right to be heard in opposition to any survey or location which the district attorney may deem un-

just; and this, whether it be desired to protect the interests of present or future claimants under the preemption laws, or merely the rights and interests of the government itself. The very terms of the act of 1860 [12 Stat. 34], require that "all persons claiming interests under preemption settlement, or other right or title derived from the United States, shall be represented by the district attorney, intervening in the name of the United States." It cannot be denied that the persons in whose behalf the district attorney has intervened in this instance claim "a right derived or title from the United States." But, as before intimated, even if there were no settlers on the land, or any private interests concerned to correct the location, the United States, through the district attorney, have clearly the right to protect the public interests, and to prevent injustice, by procuring a proper location of the grant.

The more important question remains: Can the claimants now be permitted to abandon the location selected as above stated, and float the grant to such portion of the land as may suit their present convenience or interests? Had the grant belonged to a single individual by whom an election was made, as above described, the point would have been too clear for argument. It is said, however, that some of the heirs of De Haro were minors, and, therefore, could not have assented to the election. It appears that for some time after the death of De Haro his title papers were in the hands of Julius R. Rose, Esq., who, probably, had the general management of the estate. On the 30th July an informal paper was executed by the heirs of De Haro, by which the administration of the estate was confided to Ramon De Saldo. This paper was signed by Josefa De Haro, the widow, Rosalia Brown, (by her husband, C. Brown,) Prudencia De Haro, and Candelavia and Carlota De Haro. De Saldo was appointed the guardian of Candelavia and Carlota De Haro, while Charles Brown was guardian of the boy Alonzo. In the exercise of the trust thus confided to him, De Saldo employed counsel to present the case to the board, and at their suggestion the survey was made, and the land designated by Brown and Denniston, who had married the daughters of De Haro.

De Saldo testifies that he had no reason to suppose that the heirs of De Haro were dissatisfied with the survey, and assigns three reasons for supposing that they were, in fact, satisfied with it: (1) Their having pointed out the lines. (2) Their preempting lands outside of the boundaries. (3) That he had in his possession a document sworn to by their father, describing the identical land as his own. There is necessarily some difficulty in cases where a rancho is owned by a large number of persons, in obtaining the consent of all to the election of any

particular tract. As the land must ordinarily be surveyed in a compact form and in one entire tract, the choice of majority in interest, it would seem, ought to govern. And where, as in this case, the designation has been made and acted upon by the representatives of two of the principal heirs, one of whom was also guardian for another heir, and with the full knowledge and acquiescence of the administrator of the estate, who was also guardian for two of the heirs, and by whom the attorneys to prosecute the claim were employed, and when the land outside the portion selected has been sectionized by the United States, and taken up by settlers in good faith, without objection or remonstrance on the part of any of the claimants, and when the election appears to have been fairly made and in the interests of all concerned, it appears to me that the United States have a right to insist that it shall be final and conclusive; and that settlers who have in good faith acquired inceptive titles to other portions of the tract, should not be deprived of their titles and their improvements by a change in the location of the grant.

I think, therefore, that the official survey should be set aside, and a new one made, in conformity with the survey by Leander Ransom, filed before the board of land commissioners.

